United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHELLE MONDRAGON,
Plaintiff,

v.

CITY OF FREMONT, et al.,
Defendants.

Case No. 18-cv-01605-NC

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: ECF 139

Officers from the Fremont Police Department on a specialized task force surveilled a teenager named Rico Tiger, who was wanted for armed robbery. They orchestrated his arrest while Tiger was swimming at an apartment complex pool with three other teens. When their plan to block Tiger's BMW in its parking space to make the arrest failed, they instead initiated a felony traffic stop. Tiger attempted to flee in the BMW and, as he drove past the officers and their unmarked vehicles, two officers shot at the BMW seven total times. They missed Tiger and instead hit 16-year-old Elena Mondragon, sitting in the passenger seat, who died of her injuries at the hospital.

In this resulting excessive force and wrongful death case brought by Elena's mother Michelle Mondragon, defendants the City of Fremont and its police officers Joel Hernandez, Jeremy Miskella, and Ghailan Chahouati move for summary judgment on all of Michelle's claims. The Court finds that under the plaintiff's version of the disputed material facts, a reasonable jury could find that the officers violated Elena's Fourth and

United States District Court
Northern District of California

Fourteenth Amendment rights under 42 U.S.C. § 1983 and that those rights were clearly established at the time of the incident. As such, the defendants are not entitled to qualified immunity. The motion for summary judgment over Michelle's claim under California's Bane Act fails for the same reasons. Additionally, the Court finds that too many disputed material facts underlie Michelle's claim for negligence. The motion for summary judgment is therefore DENIED.

## I. Background

### A. Procedural History

Plaintiff Michelle Mondragon filed her operative amended complaint in March 2020. ECF 117. Michelle brings claims on behalf of herself and on behalf of her late daughter Elena for (1) violation of Elena's Fourth Amendment right to be free from excessive force and unreasonable seizure under 42 U.S.C. § 1983; (2) violation of Michelle's Fourteenth Amendment right to familial relationship under 42 U.S.C. § 1983; (3) wrongful death (negligence) under California Code of Civil Procedure §§ 377.60 and 377.61; and (4) violation of California Civil Code § 52.1, the Bane Act. ECF 117. Defendants the City of Fremont and its police officers Joel Hernandez, Jeremy Miskella, and Ghailan Chahouati now move for summary judgment over all of Michelle Mondragon's claims. ECF 139. The Court considers the defendants' motion, Michelle's opposition, the defendants' reply, all attendant exhibits, and supplemental briefing from Michelle ordered by the Court addressing *Monzon v. City of Murrieta*, 966 F.3d 946 (9th Cir. 2020) in deciding the motion for summary judgment. ECF 140, 141, 142, 145.[1]

All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). ECF 8, 65, 66.

---

[1] Defendants note that Plaintiff went five pages over the 25-page limit in her opposition brief and ask the Court to strike everything past the 25th page. The Court cautions the plaintiff to carefully follow its page length requirements in the future, but denies the defendants' request to strike the additional briefing and also notes that the defendants' reply brief contains over a full page of single-spaced text.

**B. Undisputed Facts**

On March 14, 2017,[2] 16-year-old decedent Elena Mondragon was swimming with three teenage friends at an apartment complex pool in Hayward, California. ECF 140, Declaration of Melissa Nold, Ex. 1 (Deposition of Jeremy Miskella) 45:15–48:9. Meanwhile, the Southern Alameda County Major Crimes Task Force—made up of officers from various local police departments, including the City of Fremont Police Department defendants—was working with the Fremont Police Department to surveil Rico Tiger, one of the teens at the pool with Elena. ECF 139, Declaration of Gregory M. Fox, Ex. D (Deposition of Sergio Quintero) 9:8–14, 23:21–24:2; Ex. E (Deposition of Thomas Edwards) 16:25–17:3; Ex. B (Deposition of Joel Hernandez) 11:4–6, 12:2–7; Ex. A (Deposition of Jeremy Miskella) 10:25–11:1, 15:3–5; Ex. C (Deposition of Ghailan Chahouati) 14:24–15:6. The Task Force's goal was to arrest Rico Tiger pursuant to a Ramey warrant for armed robbery with a firearm. Miskella Depo. 34:15–18. The Task Force created, and met to discuss, a written operation plan to take Tiger into custody. Quintero Depo. 27:22–28:4; Edwards Depo. 22:12–23:5; Hernandez Depo. 18:5–10, 20:17–21:7; Chahouati Depo. 30:8–21. Their discussion included the facts that Tiger was suspected of committing other armed robberies throughout the Bay Area, had been seen with handguns with extended magazines, was suspected of hitting and killing a pedestrian in a vehicle, and was known to flee from police including in a high-speed pursuit. Miskella Depo. 34:15–35:9; Quintero Depo. 28:8–29:10; Edwards Depo. 20:17–21:18; Hernandez Depo. 18:19–20:16.

The Task Force believed Tiger was driving a stolen BMW and a surveillance unit used the BMW's GPS system to track the car's location to the apartment complex in Hayward. Quintero Depo. 33:24–35:19, 37:4–38:6, 42:44–43:2. The surveillance unit told the Task Force officers that Tiger appeared to be with three other individuals, in swimming attire, likely using the pool on the warm day. *Id.* 34:10–36:6; 40:24–41:14. The officers

[2] Defendants repeatedly identify the date of the incident as May 14, 2017, in their briefing, but based on the evidence the Court determines that it occurred on March 14, 2017.

arrived at the apartment complex and identified the BMW, which was empty and parked in a parking space at the end of a cul-de-sac. *Id.* 39:8–40:8; Edwards Depo. 25:7–24, 28:12–24. The cul-de-sac was a dead-end with perpendicular parking stalls running along each side, some covered by a carport. ECF 139, Ex. 2, Declaration of Jeremy Miskella at ¶¶ 2–3. Officer Edwards drove a Toyota Camry with Officer Quintero as a passenger, Officer Miskella drove a Honda Pilot alone, and Officer Chahouati drove a Dodge Caravan containing Officers Hernandez and Taylor and a K-9 unit. Quintero Depo. 31:21–32:3; 38:19–39:4; Hernandez Depo. 41:11–18, 30:21–31:20. The vehicles were unmarked to avoid revealing the surveillance operation, but were equipped with police lighting and sirens that could be activated. Quintero Depo. 32:15–33:14; 52:15–24; Miskella Depo. 40:8–22. Officer Edwards, in plain clothes, visually located Tiger at the pool with a teen boy and two teen girls, and shared this information with the other officers via cell phone and radio. Edwards Depo. 28:25–30:9, 31:17–32:9, 33:2–10. The officers determined that attempting to arrest Tiger at the pool would be unsafe, particularly because there were other people in the pool area. Quintero Depo. 43:25–44; Hernandez Depo. 28:3–9; Chahouati Depo. 51:21–52:3, 56:19–22, 58:7–21. The officers' plan was to wait until Tiger was in the BMW and to pull the Dodge Caravan in front of the BMW to prevent it from exiting the parking space to arrest Tiger. Quintero Depo. 50:4–51:21, 53:8–11; Miskella Depo. 49:19–22, 51:16–25, 52:15–20, 53:9–21.

The teens left the pool area in their swimming attire and got into the BMW, with Tiger in the driver's seat, Elena Mondragon in the passenger seat, and the other boy and girl in the back seat. Quintero Depo. 49:12–20. The officers knew that the other teens were in the car with Tiger. *Id.* An unrelated car pulled into the cul-de-sac, so the officers waited for it to safely exit before approaching the BMW with the Caravan. Quintero Depo. 54:1–55:1; Chahouati Depo. 59:22–60:6. The BMW then pulled out of its parking space at the same time as the Caravan entered the cul-de-sac: it was now too late to effectuate the original plan. Quintero Depo. 55:2–56:6. Instead, officers decided to attempt a felony car stop. Miskella Depo. 62:16–63:19. Chahouati activated the lights and

sirens on the Caravan. Quintero Depo. 55:19–21; Hernandez Depo. 24:9–14. Chahouati drove the Caravan down the cul-de-sac and slightly toward the left, stopping it nose-to-nose with the BMW to prevent the BMW's exit. Chahouati Depo. 61:22–63:4; 66:24–67:23. Tiger stopped the BMW about 10 to 15 feet away from the Caravan. *Id*. Miskella stopped the Honda Pilot right behind the Caravan and slightly to the right. Miskella Depo. 68:23–69:20.

Officers Chahouati, Hernandez, Taylor, and Miskella exited their vehicles, shouting, "police, hands up!" at Tiger. *Id*. 70:24–71:16; Hernandez Depo. 34:7–19. Miskella stood behind the Caravan with a view of the BMW. Miskella Depo. 72:5–25; Miskella Decl. ¶ 6. The officers were in plain clothes but wore police vests on top. Quintero Depo. 59:12–60:1. Chahouati and Hernandez thought Tiger would try to exit the BMW and flee on foot because the BMW couldn't fit between the Caravan and the parked cars to its side. Chahouati Depo. 74:7–24, 76:25–77:3; Hernandez Depo. 37:15–38:14.

Tiger reversed the BMW to the back end of the cul-de-sac, about 30 to 40 yards, as the officers continued to shout commands. Hernandez Depo. 38:23–39:5; Miskella Depo. 74:10–20, 75:16–18. The BMW stopped once it reached the end of the cul-de-sac. Quintero Depo. 56:10–19. After a few seconds' pause, the officers heard the BMW engine rev and saw it accelerate forward toward the driver's side of the Caravan. Quintero Depo. 61:15–62:9; Edwards Depo. 39:19–21; Hernandez Depo. 39:21–41:11; Miskella Depo. 75:19–77:12. Hernandez was standing behind the Caravan's open passenger side door. Hernandez Depo. 39:6–14. The officers were shocked because they did not perceive that there was enough room between the Caravan and the parked cars for the BMW to drive past. Hernandez Depo. 40:20–41:11.

The BMW squeezed past the Caravan, hitting the parked cars on its other side. Miskella Depo. 78:3–19; Chahouati Depo. 92:5–94:2; Quintero Depo. 62:24–63:4. The BMW then headed toward Officer Miskella, who ran backward to get out of its path. Miskella Depo. 78:29–79:20; Miskella Decl. ¶ 7. While he ran backward, Miskella fired five rounds from his AR-15 rifle at the BMW. *Id*. 79:21–80:10; Miskella Decl. ¶ 9. As



United States District Court
Northern District of California

the BMW pushed past the Caravan, Officer Hernandez ran around the back of the Caravan and fired two shots from his AR-15 at Tiger. Hernandez Depo. 43:1–44:4, 49:10–19. The BMW then exited the cul-de-sac. Quintero Depo. 62:24–63:4. None of the officers had activated their body-worn cameras. Hernandez Depo. 47:4–7; Miskella Depo. 84:1–85:23. Elena Mondragon was hit with three to five of the gunshots and died of her wounds. *See* ECF 140, Ex. 14 (Autopsy Report). A Hayward Police Department investigation of the incident found that some of Officer Miskella's shots had struck Elena. Miskella Decl. ¶ 9.

### C. Disputed Facts

#### 1. Where Officer Chahouati Stood

Officer Chahouati testified that, as Tiger forced the BMW between the Caravan and parked cars, he was standing behind the Caravan's open driver's side front door (mirroring Officer Hernandez's position behind the Caravan's open passenger side front door). Chahouati Depo. 73:8–74:24; Hernandez Depo. 39:6–14. Chahouati testified that, as the BMW hit the Caravan's driver's door, he jumped into the van. Chahouati Depo. 92:5–91:23. As he did so, the BMW forced the van door shut and injured his knee. Miskella Depo. 78:3–19; Chahouati Depo. 92:5–94:2; Quintero Depo. 62:24–63:4. Hernandez testified that he feared that Chahouati would be hit and killed by the BMW. Hernandez Depo. 42:12–24.

Plaintiff places these facts in dispute based on Officer Miskella's testimony. Officer Miskella parked the Honda Pilot behind and a couple of feet to the right of Caravan. Miskella Depo. 68:9–69:17. He exited the Pilot and walked behind the van, then out past the driver's side of the van until he could see the BMW. *Id*. 71:8–12. Officer Miskella took a position slightly to the left of the Caravan's open driver's side door so that he could see around the door. *Id*. 72:7–9. He could see that the driver's side door was fully open and he could see around the door to the BMW. *Id*. 72:18–25.

Despite this vantage point, Officer Miskella testified that he did not recall seeing any person outside of the van until after the shooting was over. *Id*. 72:20–22. Officer Miskella's view was unobstructed, yet he did not recall ever seeing anybody in the van's

United States District Court
Northern District of California

driver's side door. *Id.* 74:1–6. When the BMW drove past the Caravan, Officer Miskella recalled seeing the driver's side door swing closed and slam shut but did not see a man jumping into the van. *Id.* 77:13–78:2. Officer Miskella testified that he did not observe any person in the doorway at all. *Id.* [3]

**2. The BMW's Speed and Striking of the Caravan**

The officers testified that the BMW struck the driver's side door of the Caravan at up to 45 miles per hour, slamming the driver's side door shut. Quintero Depo. 61:15–62:9; Edwards Depo. 39:19–21; Hernandez Depo. 39:21–41:11; Miskella Depo. 75:19–77:12. Plaintiff puts these facts in dispute by attaching photographs of the Caravan that show no damage at all to the van's front left side or to the driver's side front door. ECF 140, Nold Decl. at Ex. L; ECF 141, Exs. 10–11. The photographs depict the Caravan's driver's side front door as wholly unscathed; instead, there appear to be quite obvious visible dents and scratches along the back door, back wheel, and back bumper of the driver's side of the vehicle. *Id.* These photographs put in dispute the facts of how quickly the BMW was accelerating towards the Caravan and where the BMW struck the Caravan.

**3. Whether Officers Fired into the Side or Back of the BMW**

Officer Miskella, who fired five shots including the shots that struck Elena, testified that he did not fire any rounds at the back of the BMW and did not shoot at the vehicle as it passed him. Miskella Depo. 80:1–81:11. Officer Hernandez, who fired two shots, did not testify as to the position of the BMW relative to his weapon when he fired his two shots. *See generally* Hernandez Depo. 43–44.

Plaintiff attaches photos of the BMW with bullet trajectory rods. ECF 141. The first photo depicts the back of the black BMW, its back windshield shattered completely

---

[3] Plaintiff mischaracterizes Officer Miskella's testimony, stating that "Defendant Miskella denies that Defendant Chahouati was ever standing outside the van." ECF 140 at 9. Officer Miskella's testimony was that he did not recall seeing Officer Chahouati in the doorway and did not see any person jump into the van from the doorway area. Miskella Depo. at 77–78. Nevertheless, the Court finds that Officer Miskella's testimony—given that his view of the door area was unobstructed—is enough to at least put in dispute the fact of where Officer Chahouati was positioned at the time of the collision.

and wide open. That image shows a bullet trajectory rod protruding from just underneath the back windshield. The second image depicts the driver's side back passenger door of the BMW with a bullet trajectory rod protruding from just above the door handle, underneath the window. The third image depicts the front hood of the BMW with a bullet trajectory rod protruding from the center-right area of the hood. The front windshield appears somewhat damaged in this image but is not shattered and is mostly intact. The fourth image depicts the front of the BMW, which has significant damage primarily to its passenger side bumper and headlight area.

Plaintiff argues that Elena Mondragon's autopsy report also indicates that the bullets that struck her entered through the side of the car, meaning that Officer Miskella shot at the side of the BMW as it passed him. *See* ECF 140 at 27. The coroner's report describes five gunshot wound projectile pathways. Autopsy Report at 7. One perforating gunshot wound was in Elena's right arm. *Id*. at 9. The report describes the entrance of that gunshot in Elena's lower right arm. *Id*. at 10. Other gunshot wounds entered Elena's inner left leg. *Id*. at 10–12. Bullets entering Elena's right arm or the inner part of her left leg could be consistent with shots fired through side of the vehicle.

The images of the shattered back windshield and bullet holes underneath the back windshield and in the rear side door suggest that shots may have been fired at the side and back of the BMW as it drove past and away from the officer(s). The autopsy report suggests that Elena may have been struck by bullets shot through the side of the vehicle. This evidence puts at least Officer Miskella's testimony into dispute.

**II. Legal Standard**

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at 1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## III. Discussion

### A. Qualified Immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). The two-pronged qualified immunity analysis queries: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Pearson*, 555 U.S. at 232.

At summary judgment, the Court construes the facts in the plaintiff's favor but the plaintiff bears the burden to show that the law is "clearly established" against the defendants. *Saucier*, 533 U.S. at 201; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir 2006).

**1. Whether Constitutional Rights Were Violated**

**i. Fourth Amendment Unreasonable Seizure**

Defendants argue that Plaintiff's Fourth Amendment claims fail because in other cases where bystanders were accidentally shot by police officers, those shootings did not constitute a "seizure" under the Fourth Amendment. *See* ECF 139 at 10–12. Their argument is essentially that because officers were aiming at Rico Tiger and only accidentally shot Elena Mondragon, Elena was not "the object of the detention or taking." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989). But Defendants miss the much more obvious seizure that clearly occurred in this case: the felony traffic stop. Here, the officers blocked the BMW into the cul-de-sac, turned on their lights and sirens, yelled at the BMW's driver to exit the vehicle, and tried to prevent the car from leaving using both their vehicles and their AR-15s. It is well established that a traffic stop is a seizure, and that such a seizure applies to all occupants of the vehicle. *Heien v. North Carolina*, 572 U.S. 54, 60 (2014); *Brendlin v. California*, 551 U.S. 249, 255–259 (2007). When the officers initiated the felony traffic stop on the BMW as Elena Mondragon sat in its front passenger seat, she was seized for purposes of the Fourth Amendment.

Having clarified that a Fourth Amendment seizure occurred here, we next ask whether that seizure was reasonable. *Plumhoff v. Rickard*, 134. S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989)); *Tennessee v. Garner*, 471 U.S. 1 (1985). This standard requires balancing the nature and quality of the intrusion into the individual's Fourth Amendment interests against the government's countervailing interests. *Graham*, 490 U.S. at 396. The government interests at stake include the severity of the crime at issue, whether the suspect was actively resisting arrest or attempting to evade by flight, and, most importantly, whether the suspect posed an immediate threat to the safety of officers or others. *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2009); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). The question of reasonableness is asked from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. If an officer has "probable cause to believe that [a suspect]

has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12.

Here, the nature and quality of the intrusion on Elena Mondragon's interests were of the highest possible degree: she was shot and killed. The government's interests were significant: Tiger was accused of violent crimes, was known to flee from police in the past and was actively ignoring orders in the moment, and could have posed a threat to the officers or others. The degree to which Tiger posed a threat to the officers' safety depends at least in part on the disputed facts discussed above: whether Officer Chahouati was standing in the BMW's path, how quickly the BMW accelerated towards that location, and if the BMW struck the Caravan where Chahouati may have stood. These facts must be determined by a jury at trial. For the qualified immunity analysis on summary judgment, the Court adopts the plaintiff's version of these facts. *Saucier*, 533 U.S. at 201; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir 2006). Plaintiff's version is that no officer stood in the BMW's path behind the Caravan's front door, that the BMW did not accelerate as quickly as Defendants estimate, that the BMW did not strike the front of the Caravan, and that the officers shot into the side and back of the BMW once it had passed them.

Defendants rely heavily on *Monzon v. City of Murrieta*, 966 F.3d 946 (9th Cir. 2020), decided one month ago, as dispositive of the question of the officers' reasonableness. Some of the facts in *Monzon* are strikingly similar to the facts in this case. There, Junef Monzon drove a van from the end of a dead-end street toward multiple police officers and their vehicles, which were staggered throughout the street, as officers shouted commands at Monzon that he largely ignored; officers shot Monzon more than ten times and killed him. *Monzon*, 966 F.3d at 949–950. There, the Ninth Circuit held that the officers had acted reasonably given "the totality of the dynamic and quickly changing circumstances Monzon created by deliberately turning his car around and driving it toward and between five officers." *Id.* at 953.

Other facts distinguish this case from *Monzon*. First, in *Monzon* the shooting immediately followed an erratic, high-speed (100 mph) car chase and took place at almost 2:00 in the morning on an unlit street. *Id.* at 949. Each of these factors increased the threat that Monzon posed to both officers and the public. Here, the shooting occurred in the middle of the day in an apartment parking lot with no attendant car chase. Second, in *Monzon* the incident flowed from the decedent's unexpected flight from an officer who attempted to pull him over on the road. *Id.* Here, the incident flowed from the Task Force's arrest operation wherein officers intentionally orchestrated and initiated contact with Tiger based on surveillance information. Finally, and in the Court's view most significantly, the officers in *Monzon* were unaware of the presence of a passenger in the back of Monzon's van. *Id.* at 950. Here, the officers all knew that three other teens, two girls and one boy, were in the BMW with Tiger. These differences prevent the Ninth Circuit's holding in *Monzon* from disposing of the question of reasonableness in this case.

Defendants also cite to *Plumhoff v. Rickard*, 572 U.S. 765 (2014) and *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010). In *Plumhoff*, the Court held that defendant officers acted reasonably when they shot and killed a driver in an effort to terminate a dangerous high-speed car chase. 572 U.S. at 776. Here, no dangerous high-speed car chase precipitated the shooting: instead, the incident was brought about by the Task Force's own operational plan. In *Wilkinson*, the Court held that defendant officers acted reasonably when they shot and killed a driver who accelerated a stolen van within close quarters of two officers on foot, causing one officer to fall to the ground and to appear to have been run over. 610 F.3d at 551–52. Here, under Plaintiff's version of the facts, no officer was apparently hit by the BMW. Additionally, here, the officers knew that three other teens were in the BMW where in Wilkinson no passengers were injured.

The Court next addresses the issue of where Officer Chahouati was standing relative to the BMW's path. Defendants emphasize that the BMW veered straight for Officer Chahouati, and Officer Hernandez in particular repeatedly testified that he believed that Chahouati had been "murdered" when Tiger struck the Caravan's driver's side door.

Hernandez Depo. 43:1–44:20. Plaintiff argues that this storyline is fabricated to justify the shooting—that Chahouati was never in harm's way and that the front driver's side and door of the Caravan were not hit at all, or at least not with the speed and force the officers describe. A similar issue came up in *Monzon*. There, the Ninth Circuit rejected the plaintiffs' argument that Monzon would have only been sufficiently threatening if an officer had been directly in the van's path at the time the shots were fired: "[w]e have never held that an officer *must* be in the *direct path* of a moving vehicle before his use of force is deemed reasonable." *Id.* at 953–54 (emphasis in original). Monzon drove his van "near, toward, and amongst the officers on foot," and that was enough for the use of deadly force to be reasonable. *Monzon*, 966 F.3d at 952.

Here, however, the plaintiff's version of the facts does not so closely resemble *Monzon*. Plaintiff's version of the incident includes the BMW moving at a slower rate of speed and squeezing past the Caravan (where no officer stood) without even hitting or damaging the front of the van in order to leave the parking lot. This scene differs from that in *Monzon*, where the undisputed facts showed that Monzon had turned the van toward two officers, was surrounded by officers on all sides, raised his hands off the steering wheel as the van continued to turn and move toward and between officers, and collided with a police cruiser, all after crashing into a fence post. *Id.* at 955.

Here, the Court finds that the facts as Plaintiff presents them could show an unreasonable seizure by the defendants. Defendants attempted to arrest a dangerous felon despite the known presence of three teenagers in his vehicle, and then shot into the vehicle (including at its side and back) seven times while it drove past their van, failing to stop the driver but instead hitting and killing Elena Mondragon in the passenger seat. Under these facts, a reasonable jury could find that the officers lacked probable cause to believe that Tiger posed a significant threat of death or serious physical injury to anyone. *Garner*, 471 U.S. at 3. Therefore, a jury could find that their use of force was not reasonable.

**ii. Fourteenth Amendment Interference with Familial Relationship**

Plaintiff's claim for interference with familial relationship is integrally predicated upon the defendants' other allegedly unconstitutional conduct discussed above. *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004). But the standard that Plaintiff must meet to succeed on her Fourteenth Amendment due process claim is higher than the "objective reasonableness" standard required for her Fourth Amendment claim. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Instead, the plaintiff must show that the defendants' conduct shocks the conscience. *Id.* The key question here is "whether the circumstances are such that actual deliberation is practical." *Id.* If so, then the officers' "deliberate indifference" may suffice to shock the conscience. *Id.* Where an officer lacks time to deliberate and instead must make instantaneous judgments, the plaintiff mut show that the officer had "a purpose to cause harm unrelated to the legitimate object of arrest." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

Here, whether the defendants had time to deliberate before the shooting depends on how the facts of the case are framed. Of course, the officers had no idea that Tiger would reverse the BMW, rev the engine, and accelerate forward to flee the scene. But zooming out to view the incident with a broader timeline, the officers had ample time to deliberate: they had been surveilling Tiger, had met to write and discuss a plan for his arrest, and were aware before Tiger even got into the BMW that he was accompanied by three other teens who were also in the vehicle with him. Considering the coordination that led up to the arrest attempt, this case is different from those cited by Defendants like *Lewis* or *Moreland* where officers unexpectedly found themselves in a high-speed vehicle chase or breaking up a gunfight at a bar. 523 U.S. at 843; *Moreland v. Las Vegas Police Dept.*, 149 F.3d 365, 372 (9th Cir. 1998). Here, the officers had the opportunity to plan and control many aspects of the arrest attempt. Put another way, they had time to deliberate. The Court therefore applies the "deliberate indifference" standard to their conduct. *Porter*, 546 F.3d at 1137.

Under Plaintiff's view of the facts—where officers shot at the side and back of the BMW as it passed them, knowing that it contained not just Tiger but three other teens—a reasonable jury could find that the officers behaved with deliberate indifference to the harm they could cause.

**2. Whether the Rights Were Clearly Established**

The Court next asks whether the constitutional right violated was "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Pearson*, 555 U.S. at 232. The plaintiff bears the burden to show that the law is "clearly established" against the defendants. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir 2006).

Plaintiff supplies the recent Ninth Circuit decision in *Stoddard-Nunez v. City of Hayward*, 2020 WL 3074128 (June 10, 2020), where the Court found that qualified immunity should not apply on summary judgment when the plaintiff's version of the facts involved the officer firing his gun at the side and rear of a vehicle as it passed. 2020 WL 3074128, at *2–3.[4] Because *Stoddard-Nunez* was decided after this incident, it could not have put defendant officers on notice as to the constitutionality of their actions. *Acosta v. City and County of San Francsico*, cited therein, held that officers were unreasonable for shooting at a vehicle that was moving very slowly. 83 F.3d 1142 (9th Cir. 1996). That case applies here somewhat given that under Plaintiff's view of the facts, the BMW was moving slowly enough that any contact it may have made with the Caravan left no mark on the van. Similarly, in *Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007), officers' actions were deemed unreasonable when they shot a driver whose car was moving away from them.

[4] *Stoddard-Nunez* was decided after the incident here, and relies heavily on *Acosta v. City and County of San Francisco*, 83 F.3d 1143 (9th Cir. 1996), which was abrogated by *Saucier v. Katz*, 533 U.S. 194 (2001), as recognized in *Monzon*, 966 F.3d at 958. The Ninth Circuit recently affirmed its holding in *Acosta* in *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020), where it held that "an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him."

Defendants, on the other hand, emphasize the Supreme Court's statement in *Mullenix v. Luna* that it has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." 136 S. Ct. 305, 310 (2015). Indeed, under *Defendants'* view of the facts here, this case arguably involves a dangerous car chase. But Plaintiff's facts more closely resemble those in *Acosta* and *Adams*, where vehicles moved at slow rates of speed and not in manners that endangered the officers or others. As such, the Court finds that Elena Mondragon's right not to be shot by officers through the side and back of a vehicle that was neither moving rapidly nor moving in the direction of any officers or bystanders was clearly established at the time of the incident. The Court determines that qualified immunity is not established at this stage of the case. The motion for summary judgment as to the plaintiff's Fourth and Fourteenth Amendment claims are hereby DENIED.

**B. Negligence**

A claim for negligence requires the plaintiff to show that the defendant owed them a duty of care, a breach of that duty, and injury proximately caused. *Lopez v. City of Los Angeles*, 196 Cal.App.4th 675, 685 (2011). Law enforcement officers have a duty to "use reasonable force under the totality of the circumstances." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526, n.10 (2009). "Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation . . . summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 632 (2013). Negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.*

Here, the defendants' undisputed pre-shooting tactical decisions present a set of facts that could allow a reasonable jury to find that they behaved negligently. Defendants state that "Chahouati had no legal duty to refrain from diving into the Caravan to avoid being run down by the BMW . . . he did not breach any duty of care by jumping out of the

United States District Court
Northern District of California

way of the advancing BMW." ECF 139 at 23. Officer Chahouati is not being sued for jumping into the BMW; Plaintiff disputes that he did so at all. The officers' alleged negligence was in their arrest attempt of Tiger that left Elena Mondragon dead. Officers chose to attempt to arrest a known dangerous felon while three other teens were in a vehicle with him, and then pivoted to attempt a felony traffic stop on the vehicle when their original plan for arrest failed. Thereafter, a jury will need to decide which disputed material facts to adopt as to the shooting incident itself. These disputed facts preclude summary judgment on this claim. The motion for summary judgment as to the plaintiff's negligence claim is hereby DENIED.

**C. Immunity Under Gov't Code §§ 815.2, 820.2, and 820.8**

Defendant officers argue that they are immune from liability under California Government Code §§ 815, 820.2, and 820.8. However, this immunity does not apply to officers sued for excessive force. *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264 (1967). The officers are thus not entitled to this defense.

**D. The Bane Act, California Civil Code § 52.1**

The elements of an excessive force claim under the Bane Act are the same as under 42 U.S.C. § 1983. *Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). Here, the Court has found that the defendants are not entitled to summary judgment on the plaintiff's Fourth Amendment claim. For the same reasons, their motion for summary judgment on the plaintiff's Bane Act claim is also hereby DENIED.

**IV. Conclusion**

Under the plaintiff's view of the disputed material facts, the Court FINDS that the defendants are not entitled to summary judgment over any of the plaintiff's claims. A jury must decide those facts at trial. The motion for summary judgment is hereby DENIED.

**IT IS SO ORDERED**

Dated: August 31, 2020



NATHANAEL M. COUSINS
United States Magistrate Judge